# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BARBARA DUHON,                        )
                                      )
            PLAINTIFF,                )
                                      )        **COMPLAINT**
v.                                    )        **Jury Trial Demanded**
                                      )
KONINKLIJKE PHILIPS N.V.;             )
PHILIPS NORTH AMERICA LLC;            )
PHILIPS HOLDING USA, INC.;            )
PHILIPS RS NORTH AMERICA LLC          )
f/k/a RESPIRONICS, INC.; and          )
PHILIPS RS NORTH AMERICA              )
HOLDING CORPORATION,                  )
                                      )
            DEFENDANTS.               )
_____)

## COMPLAINT

Plaintiff Barbara Duhon, by and through her undersigned counsel, hereby submits the following Complaint and Demand for Jury Trial against Defendants Koninklijke Philips N.V. ("Royal Philips"); Philips North America LLC ("Philips NA"); Philips Holding USA, Inc. ("PHUSA"); Philips RS North America LLC f/k/a Respironics, Inc. ("Philips RS"); and Philips RS North America Holding Corporation ("RS Holding") (collectively referred to as "Philips" or "Defendants") and alleges the following upon personal knowledge and belief as well as investigation of counsel:

## INTRODUCTION

1.      Philips designs, manufactures, markets, imports, sells and distributes a variety of sleep and respiratory care products.

2.      Philips designs, manufactures, markets, imports, sells and distributes a variety of Continuous Positive Airway Pressure ("CPAP") and BiLevel Positive Airway Pressure ("BiPAP") devices for patients with various types of sleep apnea.

3.      Philips also designs, manufactures, markets, imports, sells and distributes a variety of mechanical ventilator devices for patients with respiratory failure conditions.

4.      On June 14, 2021, Philips issued a voluntary recall notification for many of its CPAP and BiLevel PAP devices as well as a number of its mechanical ventilator devices (the "Recalled Devices").[1]

5.      In its voluntary recall notification, Philips advised of potential health risks related to the polyester-based polyurethane ("PE-PUR") sound abatement foam used in the affected devices.

6.      Philips informed patients using these affected devices of potential risks from exposure to degraded sound abatement foam particles and exposure to chemical emissions from the sound abatement foam material, specifically the PE-PUR.

7.      Specifically, Philips notified patients that the risks related to the issues with the sound abatement foam include headache, irritation, inflammation, respiratory issues and possible toxic and carcinogenic effects.

8.      Philips announced these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."

9.      Philips knew about these very substantial and material risks long before they announced the voluntary recall. Patients who use the Recalled Devices have complained about black particles in their machines for years.  Philips publicly warned only its shareholders and its

---

[1] These include the following models: E30; DreamStation ASV; DreamStation ST, AVAPS; SystemOne ASV4; C Series ASV, S/T, AVAPs; OmniLab Advanced Plus; SystemOne (Q Series); DreamStation CPAP, Auto CPAP, BiPAP; DreamStation Go CPAP, APAP; Dorma 400, 500 CPAP; REMStar SE Auto CPAP; Trilogy 100 and 200; Garbin Plus, Aeris, LifeVent; A-Series BiPAP Hybrid A30; A-Series BiPAP V30 Auto; A-Series BiPAP A40; and A-Series BiPAP A30.

customers about these hazards on or about April 26, 2021 and did not warn the individual users until they voluntarily recalled the Recalled Devices on June 14, 2021.

10.     On July 22, 2021, The U.S. Food & Drug Administration ("FDA") identified Philips' recall as a Class 1 Recall, the most serious type of recall which includes cautioning that use of these devices may cause serious injury or death.

11.     Plaintiff, Barbara Duhon, was diagnosed with obstructive sleep apnea syndrome on or about December 20, 2012.

12.     Plaintiff was prescribed and purchased Philips' now-recalled device, REMStar Auto, serial number P08120552D411, to treat her obstructive sleep apnea syndrome on or about March 5, 2013.  Plaintiff used this device as prescribed by her physician.  More specifically, Plaintiff used this device on a daily basis for approximately eight years.

13.     In May 2021, Plaintiff was prescribed and purchased a second Philips' now-recalled device, DreamStation, serial number J2953614637E0, to treat her obstructive sleep apnea syndrome.  Plaintiff used this device as prescribed by her physician.  More specifically, Plaintiff used this device on a daily basis as directed by her physician until she could obtain a new and safe device.

14.     The REMStar Auto and DreamStation recalled devices will be referred to as the "Subject Devices."

15.     On or about March 19, 2021, Plaintiff was diagnosed with a glomangiopericytoma ("GPC"), a rare vascular neoplasm of the nasal cavity and paranasal sinuses.

16.     As a direct and proximate result of Philips' conduct, Plaintiff has suffered serious and substantial life-altering injuries, pain and suffering and has undergone surgery.

3

17.     As a direct and proximate result of the Subject Devices designed, manufactured, marketed, imported, sold and distributed by Philips, Plaintiff has suffered physical, emotional and financial injuries, including her diagnosis of glomangiopericytoma.

18.     Plaintiff would not have purchased and used these products if she had known they were defective, contained toxic and carcinogenic by-products and would be subject to a recall for containing defective materials.  As a result of the recall, Plaintiff was forced to obtain a new CPAP device.

## PLAINTIFF

19.     Plaintiff, Barbara Duhon, is an adult resident and citizen of Lake Charles, Louisiana located in Calcasieu Parish.

20.     Plaintiff has been a resident and citizen of Lake Charles, Louisiana since approximately 1958.

21.     Plaintiff was prescribed the Subject Devices while a resident of Lake Charles, Louisiana.  She purchased the Subject Devices in Lake Charles, Louisiana and the use of the Subject Devices occurred in Lake Charles, Louisiana.

22.     From 2013 to May 2021, Plaintiff used the REMStar Auto daily to treat her obstructive sleep apnea syndrome. Sometimes, Plaintiff used the REMStar Auto multiple times per day.

23.     At all times Plaintiff used the REMStar Auto in accordance with the guidelines, manual and instructions for use set forth by Defendants and as provided to her with the Subject Devices.

24.     At all times Plaintiff used the REMStar Auto for a purpose for which the device was marketed, designed and intended.

25. At all times Plaintiff used the REMStar Auto in accordance with the directions and instructions given by her prescribing physician as well as the directions and instructions given by the durable medical equipment provider of the Subject Device.

26. Beginning approximately in May 2021 until early October 2021 when she received her non-Philips replacement device, Plaintiff used the DreamStation daily to treat her obstructive sleep apnea syndrome. Sometimes, Plaintiff used the DreamStation multiple times per day.

27. At all times Plaintiff used the DreamStation in accordance with the guidelines, manual and instructions for use set forth by Defendants and as provided to her with the Subject Device.

28. At all times Plaintiff used the DreamStation for a purpose for which the device was marketed, designed and intended.

29. At all times Plaintiff used the DreamStation in accordance with the directions and instructions given by her prescribing physician as well as the directions and instructions given by the durable medical equipment provider of the Subject Device.

30. As a result of using the recalled Subject Devices, Plaintiff has suffered personal injuries including her diagnosis of glomangiopericytoma. This injury would not have occurred but for the defective nature of the recalled Subject Devices and Defendants' wrongful conduct.

31. On March 19, 2021, Plaintiff underwent a partial resection nasal endoscopy with polypectomy, left submucosal resection of the inferior turbinates, bilateral therapeutic outfracture of the inferior turbinates and bilateral use of extracranial stereotactic image guidance.

32. Based upon her pathology, Plaintiff was diagnosed with glomangiopericytoma ("GPC"), a rare vascular neoplasm of the nasal cavity and paranasal sinuses.

33. This diagnosis was re-confirmed on April 14, 2021 by University of Michigan/Michigan Medicine Laboratories.

34. On July 9, 2021, Plaintiff underwent additional surgery, specifically an endoscopic sinus surgery with excision of sinonasal tumor, left maxillary antrostomy and removal of disease, left excision of concha bullosa, left complete ethmoidectomy, left sphenoidotomy and removal of disease, excision of sinonasal and skull base tumor with reconstruction of skull base.

35. Plaintiff's use of the unreasonably dangerous recalled Subject Devices were a direct and proximate cause of the development and progression of her glomangiopericytoma resulting in invasive surgeries, severe physical pain and suffering and emotional and mental distress.

36. Plaintiff is currently required to undergo biopsies every six months for the next five years. Plaintiff will also need future treatment and monitoring including possibly requiring future surgery.

37. Plaintiff has undergone significant treatment, will be required to undergo significant treatment in the future and now requires constant and continuous medical monitoring and treatment due to the defective nature of the recalled subject devices and Defendants' negligent and wrongful conduct.

38. As a result of the aforesaid conduct and recalled Subject Devices designed, manufactured, sold, distributed, marketed, advertised and promoted by Defendants, Plaintiff was injured resulting in invasive surgeries, severe physical pain and suffering and emotional distress. As a result of such injuries, Plaintiff has suffered damages for which compensatory and punitive damages should be awarded.

## **DEFENDANTS**

39.     Defendant Koninklijke Philips N.V. ("Royal Philips") is a public limited liability company established under the laws of The Netherlands, having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the parent company of Philips North America LLC, Philips Holding USA, Inc., Philips RS North America LLC f/k/a Respironics, Inc., and Philips RS North America Holding Corporation.  Royal Philips can be served with process via the *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* ("Hague Service Convention").

40.     Defendant Philips North America LLC ("Philips NA") is a Delaware limited liability corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips. Upon information and belief, Philips NA manages the operation of Royal Philips's various lines of business, including Philips RS, in North America.  The sole member of Philips NA is PHUSA, which is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA has a registered agent in Massachusetts, Corporation Service Company, located at 84 State Street, Boston, Massachusetts 02109.  Accordingly, Philips NA is a citizen of Massachusetts and Delaware—the states where its sole member, PHUSA, Inc., is incorporated and has its principal place of business.

41.     Defendant Philips Holding USA, Inc. ("PHUSA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. PHUSA is a holding company that is the sole member both of Defendant Philips NA and RS Holding.  Accordingly, PHUSA is a citizen of Massachusetts and Delaware.

42.     Defendant Philips RS North America LLC f/k/a Respironics, Inc. ("Philips RS") formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[2]  Philips RS has a registered agent in Massachusetts, Corporation Service Company, located at 84 State Street, Boston, Massachusetts 02109.  Philips RS North America LLC is wholly owned by a single member, Philips RS North America Holding Corporation, which is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Cambridge, Massachusetts 02141. Philips RS North America is wholly owned by Philips Holding USA Inc.  Accordingly, Philips RS is a citizen of Massachusetts and Delaware.

43.     Philips RS North America Holding Corporation ("RS Holding") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by PHUSA.  Accordingly, Philips RS North America Holding Corporation is a citizen of Massachusetts and Delaware.

44.     Royal Philips, Philips NA, PHUSA, Philips RS and RS Holding are hereinafter collectively referred to as "Philips" or "Defendants."

## JURISDICTION AND VENUE

45.     At all times pertinent to this Complaint, Defendants were and continue to be in the business of designing, manufacturing, marketing, promoting, advertising and selling devices for the treatment of obstructive sleep apnea, including the REMStar Auto and DreamStation prescribed for, purchased and used by the Plaintiff.

46.     At all times pertinent to this Complaint, Defendants were the mere alter egos or instrumentalities of each other. There is such a unity of interest and ownership between Defendants that the separate personalities of their entities ceased to exist.

---

[2] *Philips announces completion of tender offer to acquire Respironics*, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed June 30, 2021).

47.     Upon information and belief, Defendants operated as a single enterprise, equally controlled each other's business affairs, commingled their assets and funds, disregarded corporate formalities and used each other as a corporate shield to defeat justice, perpetuate fraud and evade contractual and tort liability.

48.     At all times pertinent to this Complaint, Defendants acted in all respects as agents or apparent agents of one another.

49.     At all times pertinent to this Complaint, Defendants acted in concert in the designing, manufacturing, marketing, promoting, advertising and selling of devices for the treatment of obstructive sleep apnea, including the Subject Devices.

50.     Defendants combined their property and labor in a joint undertaking for profit, with rights of mutual control over each other, rendering them jointly liable to Plaintiff.

51.     Defendants regularly transact business in Massachusetts that includes marketing and selling devices for the treatment of obstructive sleep apnea, derive substantial revenue from their business transactions in Massachusetts, and have purposely availed themselves of the privilege of doing business in Massachusetts.

52.     Defendants shipped or participated in shipping the Subject Devices and other devices with the reasonable expectation that the devices could or would be purchased and used in the State of Louisiana through the stream of commerce.

53.     Plaintiff is a citizen of the state of Louisiana.

54.     Defendants Philips NA, PHUSA, Philips RS, and RS Holding are each citizens of the states of Massachusetts and Delaware.

55.    Defendant Royal Philips is a citizen of The Netherlands and Royal Philips regularly transacts business in Massachusetts and therefore receives profits through business transactions in the State of Massachusetts.

56.    Defendant, Koninklijke Philips N.V. is the parent company of Defendant Philips North America LLC, its largest subsidiary in the United States and it is also the parent company of Defendant, Philips RS North America LLC.   Upon information and belief, Defendant, Koninklijke Philips N.V., exercises control over Philips North America LLC with regard to the day-to-day operations of the subsidiary and the conduct underlying this dispute.

57.    Upon information and belief, Defendants, Koninklijke Philips N.V. and Philips North America LLC, have overlapping leadership and personnel on the Executive Committee, Board of Management and Supervisory Board.

58.    Upon information and belief, the Executive Committee of Defendant, Koninklijke Philips N.V., operates under the chairmanship of the Chief Executive Officer and Supports the Board of Management in the deployment of Philips' strategy and policies, and the achievement of its objectives and results.[3]

59.    Upon information and belief, The Supervisory Board of Defendant, Koninklijke Philips N.V., operates as a separate and independent body and supervises the policies of the executive management and the general course of affairs of Philips and advises the executive management.[4]

60.    Plaintiff alleges damages that exceed $75,000, exclusive of interest and costs.

---

[3] https://www.philips.com/a-w/about.html
[4] https://www.philips.com/a-w/about.html

61. Thus, This Court has original jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a)(1)–(2), as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

62. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Philips NA, PHUSA, Philips RS, and RS Holding each has their principal place of business in this District and are thus residents of this District.

63. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District as all Defendants, including Royal Philips, designed, manufactured, marketed, promoted, advertised, sold and profited from the Recalled Devices in Massachusetts.

64. Further, Defendant Royal Philips is not a resident of the United States, and thus venue is proper in this District under 28 U.S.C. § 1391(b)(3), as it may be sued in any judicial district.

65. This Court's exercise of personal jurisdiction over Defendants comports with due process.

## I.      **BACKGROUND**

66. At all relevant times, Defendants designed, manufactured, marketed, sold, distributed profited from a lineup of CPAP and BiPAP devices as well as mechanical ventilator devices under its "Sleep & Respiratory Care" portfolio. These devices are designed to assist individuals with a number of sleep, breathing and other respiratory conditions, including obstructive sleep apnea syndrome.

67.     Instead of adequately testing and assuring the safety of the Recalled Devices, Defendants sought and obtained FDA approval to market the Recalled Devices, including the Subject Devices used by Plaintiff, under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act.  Section 510(k) allows marketing of a medical device if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976 and no formal review for safety or efficacy is required.

### A.     Continuous Positive Airway Pressure Therapy

68.     Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a nasal or facemask device which helps an individual breathe by increasing the air pressure in an individual's throat.

69.     Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance and long-term health.

70.     CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

### B.  Bi-Level Positive Airway Pressure Therapy

71.  Bi-Level Positive Airway Pressure therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP is distinguishable because BiPAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. BiPAP devices deliver one level of pressurized air (the inspiratory positive level) to assist as a person inhales and another level (the expiratory level) as a person exhales.

### C.  Philips' Sleep & Respiratory Care Devices Were Endangering its Users

72.  On April 26, 2021, as part of its Quarterly Report for Q1 2021, Philips disclosed for the first time to its shareholders, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR "sound abatement" foam Philips used to minimize noise in several CPAP and BiPAP respirators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[5]

73.  Philips has utilized PE-PUR sound abatement foam to dampen device vibration and sound during routine operation.

---

[5] *First Quarter Results*, PHILIPS (Apr. 26, 2021),
//https: www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf
(accessed June 30, 2021).

74.     On June 14, 2021, as a result of ongoing review following the announcement on April 26, 2021, Philips issued a voluntary recall notification for affected devices.[6]

75.     In its recall notification, Philips identified examples of potential risks that included exposure to degraded sound abatement foam particles and exposure to chemical emissions from the sound abatement foam material.[7]

76.     Philips reported that, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening, cause permanent impairment or require medical intervention to prevent permanent impairment.[8]

77.     According to Philips' recall notice, the PE-PUR foam used in Recalled Devices puts Recalled Device users at risk of suffering from the following health harms: "*Particulate exposure* can cause headache, irritation [skin, eye, and respiratory tract], inflammation, respiratory issues, and possible toxic and carcinogenic effects[;]" whereas the "potential risks of *chemical exposure due to off-gassing* include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and *carcinogenic* effects."[9]

---

[6] *Medical Device recall notification (U.S. only) / field safety notice (International Markets)*, PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 30, 2021).

[7] *Philips issues recall notification*, PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 30, 2021) (emphasis added).

[8] *Id.*

[9] *Philips issues recall notification*, PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 30, 2021) (emphasis added).

### D. Philips Recall and New Product Launch

78. Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall in total.[10]

79. According to FDA Form 483 which was issued to Philips Respironics, Inc. (with dates of inspection of August 26, 2021 through November 9, 2021) the recall targets "…over 15 million Philips Respironics ventilator, CPAP, and BiPAP devices, due to polyester polyurethane foam degradation and volatile organic compound emission, which was publicly announced on 06/14/2021."[11]

80. Philips designs, manufactures and sells CPAP machines, BiPAP machines and mechanical ventilators, among other products. According to Philips's 2020 Annual Report, Sleep & Respiratory Care constituted approximately 49% of Philips's total sales in its Connected Care line of business, which in turn accounted for 28% of Philips's overall sales of about €19.535 billion.

81. Philips's flagship CPAP/BiPAP machine family is known as the "DreamStation" family line, which includes the original DreamStation launched in October 2015, and the DreamStation Go (a travel version). Philips sells DreamStation products through its subsidiary Respironics that Philips acquired in 2008.

82. Philips' recalled CPAP and BiPAP machines contain PE-PUR foam for sound abatement and air is required to pass through this foam before it is pumped into the patient's airway.

---

[10] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (accessed June 29, 2021).
[11] Department of Health and Human Services Food and Drug Administration FDA Form 483 https://www.fda.gov/media/154099/download?utm_medium=email&utm_source=govdelivery

83.     On or about April 13, 2021, Philips announced that it was launching the DreamStation 2, the next-generation machine in its DreamStation product family.  Interestingly, the DreamStation 2 does not contain the PE-PUR foam for sound abatement.

84.     Less than two weeks later, on April 26, 2021, Philips announced in its Q1 2021 Quarterly Report:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone*), and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.
>
> [*)Potential Risks Associated With The Use of Ozone and Ultraviolet (UV) Light Products for Cleaning CPAP Machines and Accessories: FDA Safety Communication.]

85.     On June 14, 2021, Philips issued a voluntary recall for many of its CPAP and Bi-Level devices as well as a number of its ventilator devices.

86.     Philips issued the following advice to patients using any of the Recalled Devices:

- "For patients using BiLevel PAP and CPAP devices: Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[12]

- "For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps."[13]

---

[12] *Medical Device recall notification (U.S. only) / field safety notice (International Markets)*, PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 30, 2021).

[13] *Id.*

87.     Upon information and belief, Philips timed its recall to coincide with the launch of its next generation CPAP platform, DreamStation 2, which purportedly does not suffer from the same PE-PUR foam issues.

88.     On the same day, Philips provided additional information in an announcement entitled "Clinical information for physicians," which explained that the foam breakdown "may lead to patient harm and impact clinical care." Philips wrote:

> While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.

89.     The announcement by Philips detailed two types of hazards from the PE-PUR foam in the devices:  (1) dangers due to foam degradation exposure and (2) possible exposure to chemical emissions from the breaking down of the PE-PUR foam.  The first hazard is:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.
>
> The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:
>
> - Toluene Diamine
> - Toluene Diisocyanate
> - Diethylene glycol.[14]

---

[14] *Sleep and Respiratory Care update, Clinical information for physicians*, PHILIPS (June 14, 2021), https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-

90.     The European Union considers Toluene Diisocyanate "highly toxic" and has concluded that Toluene Diamine "cannot be considered safe for use" even as a hair dye.

91.     Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."

92.     In fact, FDA Form 483 which was issued to Philips Respironics, Inc. (with dates of inspection of August 26, 2021 through November 9, 2021) reflects that "No formal investigation, risk analysis, or CAPA were initiated, performed, or documented, in response to the at least 222,000 complaints that could potentially be related to foam degradation and received from 2008 to 2017, prior to the initiation of CPAP INV 0988 in 2018."[15]

93.     The second hazard is the possibility of VOCs, that is, chemical emissions from the PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)-[16]

---

recall-clinical-information-for-physicians-and-
providers.pdf?_ga=2.43039205.1759564883.1625006706212130326.1624473291&_gl=1*2nhu1
w*_ga*MjEyMTM
wMzI2LjE2MjQ0NzMyOTE.*_ga_2NMXNNS6LE*MTYyNTE1MTQ3MC4xNi4xLjE2MjUxN
TE1OTUuMTg. (accessed June 30, 2021).
[15] Department of Health and Human Services Food and Drug Administration FDA Form 483
https://www.fda.gov/media/154099/download?utm_medium=email&utm_source=govdelivery
[16] *Id.*

94.     Philips admitted that the risks of these VOCs include that they "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver."

### E.   PHILIPS' PLAN TO PROVIDE SAFE REPLACEMENT DEVICES TO USERS IS INEFFICIENT

95.     Philips's so-called "recall" does not actually provide patients with new CPAP, BiPAP or mechanical ventilator devices, but again suggests consumers can buy the next generation of its product. As Philips's June 14, 2021 announcement makes clear:

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.

96.     It may take a year or more to provide replacement devices.

97.     At the same time, Philips intends to profit from the so-called recall by selling more of its next generation product, the DreamStation 2.  Philips intentionally timed the recall to coincide with the launch of the DreamStation 2.

98.     Due to the design of the Recalled Devices, it is prohibitively difficult for patients to remove or replace the PE-PUR foam themselves.

99.     There is also a general shortage of available replacement machines thereby endangering those with sleep apnea who do not have access to a safe device.

100.    Patients need to use their machines every day or else their symptoms, including various forms of sleep apnea—which can be severe and life-threatening—may cause further injury.

101.    As a result, the recall by Philips leaves patients without safe, free options. Patients may buy Philips's next-generation product or a competitor's product—at full price.

102.    Pursuant to the statements issued by Philips that are set forth above, Philips has admitted that the Recalled Devices are defective and unsafe. The Recalled Devices are effectively worthless and have a far lesser value than what customers paid and would not have been purchased by patients if they were informed of the defect at the time of sale.

## II.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

103.    The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiff, her physicians and durable medical equipment provider the true risks associated with the Recalled Devices.

104.    As a result of Defendants' actions, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the risks and harms set forth and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

## CAUSES OF ACTION
## COUNT I - STRICT PRODUCTS LIABILITY–DESIGN DEFECT

105.    Plaintiff adopts and incorporates by reference all of the foregoing language of this Complaint as if fully set forth herein and further states as follows.

106.    Plaintiff pleads this count under Louisiana's Product Liability Act, LaRev. Stat. Ann. § 9:2800.52, *et seq.*

107.    At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, including the Subject Devices, which are defective and unreasonably dangerous.

108.    The Subject Devices were defective in their design or formulation in that they were not reasonably fit, suitable or safe for their intended purpose and their foreseeable risks exceeded the benefits associated with their designs. The Subject Devices are defective in design because they cause headaches, irritation of the skin, eye and respiratory tract, inflammatory respiratory issues, asthma, adverse effect to organs (including the kidneys and liver), hypersensitivity, nausea, vomiting and toxic and carcinogenic effects.

109.    The Subject Devices are more dangerous than other available devices indicated for similar conditions and uses, and the utility of the devices does not outweigh their risks.

110.    The defective condition of the Subject Devices rendered them unreasonably dangerous and not reasonably safe, and the devices were in this defective condition at the time they left the hands of Defendants.  The subject devices were expected to and did reach Plaintiff, the supplier of her devices and/or her physician without substantial change in the condition in which they were designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

111.    The Subject Devices were used for their intended purposes by Plaintiff and the Subject Devices were not materially altered or modified prior to their use.

112.    The Subject Devices are defective in design because the PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain toxic and harmful chemicals. These defects caused, among other problems, Plaintiff's glomangiopericytoma.

113.    At or before the time the Subject Devices were released into the market and/or sold to Plaintiff, Defendants could have designed the products to make them less prone to causing health harms, a technically feasible, safer alternative design that would have prevented the harm Plaintiff suffered without substantially impairing the function of the subject devices, including not using any PE-PUR foam.  In fact, Defendants have purportedly designed such a product with the DreamStation 2.

114.    Safer, alternative machines from other manufacturers were available that did not suffer from the defect and did not have an unreasonable risk of harm as with the recalled devices, as well as the Subject Devices, and their unsafe PE-PUR foam.

115.    The Subject Devices did not perform as an ordinary consumer would expect.

116.    Plaintiff was neither able to discover, nor could she have discovered through the exercise of reasonable diligence, the defective nature of the Subject Devices.  Further, in no way could Plaintiff have known that Defendants had designed, developed and manufactured the Subject Devices in a way as to make the risk of harm or injury outweigh any benefits.

117.    The Subject Devices were being used in a way in which the Defendants intended at the time they were prescribed and sold to Plaintiff.

118.    Defendants had a duty to create a device that was not unreasonably dangerous for its normal, intended use.  Defendants breached this duty.

119.    Defendants knew or should have known that the recalled devices, including the Subject Devices, would be prescribed to patients and that physicians and patients were relying on them to furnish a safe and suitable device.  Further, Defendants knew or should have known that patients for whom the Recalled Devices would be used, such as Plaintiff, could be and would be affected by the defective design and composition of the devices.

120.    Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold and distributed defective devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

121.    As a direct and proximate result of Defendants' placement of the Subject Devices into the stream of commerce and Plaintiff's use of the product as designed, manufactured, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical, emotional and mental injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

### COUNT II - STRICT PRODUCTS LIABILITY–FAILURE TO WARN

122.    Plaintiff adopts and incorporates by reference all of the foregoing language of this Complaint as if fully set forth herein and further states as follows.

123.    Plaintiff pleads this count under Louisiana's Product Liability Act, La. Rev. Stat. Ann. § 9:2800.52, *et seq*.

124.    At all times herein mentioned, Defendants designed, developed, researched, tested and knew or should have known about significant health risks with the Subject Devices.

23

125.    At all times herein mentioned, Defendants advertised, promoted, marketed, sold and distributed the Subject Devices that were used by Plaintiff.

126.    The Subject Devices were expected to and did reach the usual consumers, handlers and persons coming into contact with said devices, without substantial change in the condition in which they were produced, manufactured, sold, distributed and marketed by the Defendants.

127.    Defendants each had an independent duty and continuing duty to warn the medical community, Plaintiff and Plaintiff's physicians about the significance health risks and other health harms with the Subject Devices.

128.    Defendants failed to provide adequate warnings regarding the risks of the PE-PUR foam, and failed to use reasonable care to provide such warnings when Defendants knew of these risks.

129.    Defendants had information regarding the true risks but failed to warn the medical community, Plaintiff and Plaintiff's physicians.  Defendants had such knowledge for years prior to issuing the recall.

130.    Despite Defendants' obligation to warn of the significant health risks, Defendants instead chose to actively conceal this knowledge.

131.    Plaintiff would not have purchased, chosen and/or paid for all or part of the Subject Devices if she knew of the defects and the health risks of the products.

132.    Plaintiff would not have used the Subject Devices if she knew of the defects and the health risks of the products.

133.    Plaintiff used the Subject Devices in a manner intended and foreseeable by Defendants.

134.    The Subject Devices were defective due to inadequate warnings because Defendants knew or should have known that the products created a significantly increased risk of toxic and carcinogenic effects and more specifically, glomangiopericytoma, among other health impacts and failed to warn the medical community, Plaintiff and Plaintiff's physician of the nature of such risks.

135.    Defendants omitted and downplayed the significant health risks with the Subject Devices that Defendants knew or should have known from previous testing and research even prior to the Subject Devices' FDA approval.

136.    The Subject Devices' labeling and warnings were defective because they omitted and inadequately warned of the devices' health risks.

137.    Although physicians are supposed to weigh the risks and benefits before prescribing a medical device, Defendants knew that their deliberate omissions would cause physicians, including Plaintiff's physician, to prescribe the Subject Devices without being able to adequately weigh the health risk associated with using the devices.

138.    If Defendants would have properly warned about the Subject Devices' significant health risk and/or other health harms, no reasonable physician, including Plaintiff's physician, would have recommended or prescribed the Subject Devices because the potential benefits were significantly outweighed by the significant health risk and/or other harms.

139.    Had Defendants reasonably provided adequate warnings described herein, such warnings would have been heeded and no healthcare professional, including Plaintiff's physician, would have prescribed the Subject Devices and no consumer, including Plaintiff, would have purchased and/or used the Subject Devices.

140. As a direct and proximate result of Defendants' placement of the Subject Devices into the stream of commerce and Plaintiff's use of the product as designed, manufactured, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical, emotional and mental injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT III - STRICT LIABILITY–MANUFACTURING DEFECT

141. Plaintiff adopts and incorporates by reference all of the foregoing language of this Complaint as if fully set forth herein and further states as follows.

142. Plaintiff pleads this count under Louisiana's Product Liability Act, La Rev.Stat. § 9:2800.52.

143. At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, including the Subject Devices, which are defective and unreasonably dangerous.

144. The Subject Devices were expected to and did reach Plaintiff without a substantial change in its condition.

145. The finished Subject Devices deviated, in terms of construction and quality, from the specifications or planned output in a manner that made them unreasonably dangerous.

146. At all relevant times, the Recalled Devices, including the Subject Devices, were defectively and improperly manufactured and designed by Defendants in that Defendants continued to supply consumers with the Recalled Devices despite having full knowledge that the devices posed substantial and avoidable bodily injury, including but not limited to toxic and carcinogenic effects and more specifically, glomangiopericytoma.

147. The foreseeable risks of the Subject Devices were known and could have been avoided.

148. At all relevant times, the Subject Devices were defectively manufactured by Defendants in that its design and formulation is more dangerous than what an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

149. At all relevant times, Defendants actively deceived users that their use of the Recalled Devices posed safety risks that far outweighed any benefits.

150. Furthermore, the Recalled Devices, including the Subject Devices, were defectively manufactured in that the PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain toxic and harmful chemicals. These defective Subject Devices cause, among other injuries, toxic and carcinogenic effects, and more specifically, glomangiopericytoma.

151. Plaintiff and other similarly situated consumers were unknowingly subjected to receiving different doses of toxins, carcinogens and other deleterious components and contaminants when using the Recalled Devices including the Subject Devices.

152. As a direct and proximate result of Defendants' placement of the Subject Devices into the stream of commerce and Plaintiff's use of the product as designed, manufactured, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical, emotional and mental injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT IV - BREACH OF EXPRESS WARRANTIES

153. Plaintiff adopts and incorporates by reference all of the foregoing language of this Complaint as if fully set forth herein and further states as follows.

27

154. Plaintiff pleads this count in accordance with La. Rev. Stat. Ann. § 9:2800.52, *et seq.*

155. Defendants, through their advertising, promotional materials and labeling, expressly warranted and affirmed that the Subject Devices were safe for their intended uses and for uses which were reasonably foreseeable.

156. Defendants' representations became a basis of the bargain.

157. Defendants made express warranties which extended beyond delivery of the Recalled Devices, including the Subject Devices, and expressly warranted for future performance of the devices. Defendants advertised, promoted and labeled the Subject Devices as being safe and effective for the treatment of sleep apnea.

158. At all relevant times, Defendants breached said express warranties in that the Recalled Devices, including the Subject Devices, were unsafe and caused severe injury. Plaintiff foreseeably used the Subject Devices without knowing of the harmful and substantial consequences to her health.

159. At all relevant times, Defendants had knowledge of the hazards and health risks posed by the Recalled Devices, including the Subject Devices, when used.

160. At all relevant times, Defendants willfully failed to disclose the defects and health risks of the Subject Devices to Plaintiff, her healthcare providers and the rest of the public that used the Recalled Devices.

161. In reliance upon the express warranties made by Defendants, Plaintiff acquired/purchased and used the Subject Devices, believing the Subject Devices were inherently safe and/or a safe treatment for sleep apnea.

162.     As a direct and proximate result of Defendants' breach of their express warranties concerning the Subject Devices, Plaintiff suffered serious physical, emotional and mental injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT V - PUNITIVE DAMAGES

163.     Plaintiff adopts and incorporates by reference all of the foregoing language of this Complaint as if fully set forth herein and further states as follows.

164.     Defendants' conduct described herein consisted of oppression, fraud and/or malice, and was done with advance knowledge, conscious disregard of the safety of others and/or ratification by Defendants' officers, directors, and/or managing agents.

165.     Despite their knowledge of the propensity of the Recalled Devices to cause serious injuries, Defendants chose profits over the safety of its consumers and American citizens suffering with sleep apnea when they sought to create and market devices posing significant health risks.

166.     Despite having substantial information about the Recalled Devices' serious and unreasonable side effects, Defendants intentionally and recklessly failed to adequately warn the public, physicians and the medical community.

167.     Further, despite having substantial information about the Recalled Devices' serious and unreasonable side effects, Defendants failed to make the decision to pull the devices from the market after receiving indications and after receiving reports from consumers who were experiencing serious injuries associated with the use of the devices.

168.     Defendants downplayed and recklessly disregarded their knowledge of the defective nature of the Recalled Devices' potential for causing serious injuries.

169.   Defendants chose to do nothing to warn the public or medical community when they knew about serious and undisclosed side effects associated with the Recalled Devices.

170.   Defendants recklessly failed to warn and adequately instruct physicians, including Plaintiff's physician, regarding the increase in reports from consumers who were experiencing serious injuries associated with the use of the Recalled Devices.

171.   Defendants' acts were willful, wanton and malicious and showed a total disregard for human life and human suffering.

172.   Such conduct justifies and aware for punitive damages in an amount sufficient to punish Defendants' conduct and deter like conduct by Defendants and other similarly situated entities in the future.

173.   Consequently, Defendants are liable for punitive damages in an amount to be determined by the jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against the Defendants jointly and severally for damages, including punitive damages if applicable, to which she is entitled by law, as well as all costs of this action, interest and attorneys' fees, to the full extent of the law, whether arising under the common law and/or statutory law, including:

a.   Judgment for Plaintiff and against Defendants;
b.   Damages to compensate Plaintiff for her injuries (past, present and future), economic losses and pain and suffering sustained as a result of the use of Defendants' Subject Devices;
c.   Pre and post judgment interest at the lawful rate;
d.   Punitive damages, if applicable, on all applicable Counts as permitted by the law;
e.   A trial by jury on all issues of the case;
f.   An award of attorneys' fees and costs; and
g.   For any other relief as this Court may deem equitable and just, or that may be available under the law of another forum to the extent the law of another forum is applied, including but not limited to all reliefs prayed for in this Complaint and in the foregoing Prayer for Relief.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts and as to all issues.

Respectfully Submitted:

/s/ Jonathan D. Orent
Jonathan D. Orent (Local Counsel)
MA BBO # is 660571
Motley Rice LLC
55 Cedar Street, Suite 100
Providence, RI 02903
(401) 457-7700 (Phone)
(401) 457-7723 (Fax)
jorent@motleyrice.com

Kimberly D. Barone Baden (Interim Co-Lead Counsel)
kbarone@motleyrice.com
Ann E. Rice Ervin
ariceervin@motleyrice.com
Roger M. "Hank" Young
hyoung@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000 (Phone)
(843) 216-9635 (Fax)

Attorneys for Plaintiff

Dated:  December 3, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 3, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this action.

By:     <u>/s/ Jonathan D. Orent</u>
        Jonathan D. Orent